UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSE ALFONSO TELLEZ-FLORES,

Petitioner,

v.

CHANCE ANDES,

Respondent.

Case No. 2:25-cv-2626-DAD-JDP (P)

FINDINGS AND RECOMMENDATIONS

Petitioner Jose Alfonso Tellez-Flores, proceeding *pro se*, seeks a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 1. He raises five claims for relief. Respondent has answered the petition, ECF No. 14, and petitioner has filed a traverse, ECF No. 15. After reviewing the pleadings, I recommend that petitioner's claims be denied.

Background

I have reviewed the background summary articulated by the state appellate court on direct appeal. It is correct, and I reproduce it here:

*Relevant Pre-Shooting Events*

Around 7:30 p.m. on May 5, 2021, defendant, his brother Felipe Tellez-Flores,[1] and Juan Mejia went to a Mexican restaurant in Sacramento.[2] They left the restaurant around 1:30 a.m. and eventually drove toward West Sacramento.

There was evidence that the three men consumed alcohol at the restaurant, and that defendant was wearing a black t-shirt.

*The Car Chase and Shooting*

Shortly before 2:00 a.m., a Chevrolet Tahoe drove into oncoming traffic and stopped alongside a Chevrolet Impala at an intersection in West Sacramento. The Impala sped off and a high-speed chase ensued. During the chase, multiple gunshots were fired at the Impala from both sides of the Tahoe.

The chase ended when the driver of the Impala, later identified as Jimenez, lost control of her car while attempting to make a turn and collided into the garage of a residence. The Tahoe came to a stop nearby after it struck a parked car and crashed into a tree. Shortly thereafter, eight gunshots were fired followed by an additional eight gunshots. The second set of gunshots were fired by a person wearing a white t-shirt. Just before these gunshots were fired, a man yelled: "Fuck Broderick."[3]

Following the shooting, three people fled the scene on foot. Two of them were wearing white t-shirts and the other was wearing a dark or black t-shirt.

*Police Response and Investigation*

Around 2:00 a.m., police officers responded to a report of a traffic collision and multiple gunshots fired near the intersection of 6th Street and Cummins Way in West Sacramento. Upon their arrival at the scene, officers found two vehicles—an Impala and a Tahoe. The Impala had major damage to the front end and had been shot multiple times.

Two people were inside the car: Jimenez was in the driver's seat, and a man, later identified as Robinson, was in the front passenger

[1] [footnote two in original text] Because Felipe has the same last name as defendant, we refer to him by his first name to avoid confusion.

[2] [footnote three in original text] Each of these individuals used Snapchat, an instant messaging social media application that allows users to share messages, images, and videos. The application also has a feature that allows users to share their location in real-time using GPS (global positioning system) data. On the night of the shooting, defendant and Felipe posted videos to their Snapchat accounts, which both had the location feature enabled. Mejia's Snapchat account also had the location feature enabled.

[3] [footnote four in original text] Broderick is a neighborhood in West Sacramento, located just west of the Sacramento River. No evidence was introduced at trial about Broderick.

seat. Jimenez, who had been shot four times, was unresponsive and died at the scene. Robinson, who had been shot once, was taken to the hospital and survived. When an officer asked Robinson to identify the person(s) who shot him, he made an obscene gesture at the officer.

The Tahoe was unoccupied. Inside, officers found one nine-millimeter cartridge casing on the front passenger side floorboard, a box of nine-millimeter ammunition on the front driver's side floorboard, and a cell phone belonging to Felipe on the rear driver's side floorboard. A record search revealed that defendant's father (Jose) was the registered owner of the Tahoe.[4]

The police found numerous nine-millimeter cartridge casings, some of which were scattered along the street (i.e., Cummins Way) and others were near the Impala. The police also found several 10-millimeter cartridge casings near the Impala. The ninemillimeter casings had different firing pin impressions (i.e., shapes), which indicated that they were fired by different guns. Based on the evidence at the scene, the police suspected there were at least three firearms used in the shooting.

An expert in latent fingerprint analysis concluded that defendant's fingerprint was on the Tahoe's interior driver's door handle. A criminalist determined that the Tahoe's steering wheel contained a mixture of deoxyribonucleic acid (DNA) from four people, with defendant as the predominant contributor. The criminalist also determined that the face mask hanging from the Tahoe's gear shift contained a mixture of DNA from two people, with defendant again as the predominant contributor.

*Relevant Post-Shooting Events*

Around 2:30 a.m., Jose picked up defendant and Felipe from an apartment complex in West Sacramento;[5] Jose was driving a silver F-150 truck with a camper shell.

Around 3:15 a.m., an officer saw this truck near the crime scene; the officer stopped the truck and told Jose that he needed to turn around and drive the opposite direction.

Although defendant told Jose that the Tahoe had been stolen, Jose never filed a stolen vehicle report. At trial, Jose testified that he drove around West Sacramento looking for the Tahoe after he picked his sons up from the apartment complex.[6]

---

[4] [footnote five in original text] Defendant and his father have the same first and last name. To avoid confusion, we refer to defendant's father by his first name, and note that all references to "Jose" are references to defendant's father.

[5] [footnote six in original text] There was evidence that the apartment complex was associated with Mejia.

[6] [footnote seven in original text] Jose testified after he was granted immunity from prosecution under section 1324.

> According to Jose, defendant never told him where to look for the Tahoe or that it had been stolen until later that morning. Jose also claimed that he never asked defendant if he was driving the Tahoe before it was stolen. Thereafter, Jose was shown a portion of his police interview in which he reported that defendant told him the Tahoe was in an accident. Upon questioning, Jose explained that defendant told him the Tahoe "had been stolen in the accident." When Jose was asked why he told the police the Tahoe had been in an accident when he knew it had been stolen, he said, "I imagined that [defendant] had an accident" because defendant "didn't want to tell me anything else."
>
> Two months after the shooting, a 10-millimeter handgun was seized by the police during a traffic stop in Sacramento. A criminalist determined that this gun was one of the guns used in the shooting. This same gun appeared in a video posted on defendant's Snapchat account, but there was no evidence revealing when the video was posted.[7]
>
> *Defendant's Police Interview*
>
> Defendant was arrested and interviewed by the police on the same day as the shooting. During that interview, which began at approximately 10:00 p.m., defendant claimed the Tahoe had been stolen the "night prior," and that he had not reported the theft because the Tahoe was uninsured.

ECF No. 13-18 at 2-6.

## Discussion

I. Legal Standards

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*, 562 U.S. 86, 97 (2011). To decide a § 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003) ("Because, here, neither the court of appeal nor the California Supreme Court issued a reasoned opinion on the merits of this claim, we look to the trial court's decision."); *McCormick v. Adams*, 621 F.3d

[7] [footnote eight in original text] The gun from the traffic stop had the same serial number as the gun that appeared on the Snapchat video.

970, 975-76 (9th Cir. 2010) (reviewing the decision of the court of appeal, which was last reasoned decision of a state court); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003) ("Because the California Supreme Court denied review of Gill's habeas petition without comment, we look through the unexplained California Supreme Court decision to the last reasoned decision . . . as the basis for the state court's judgment.") (internal quotations omitted).

Under AEDPA, a petitioner may obtain relief on federal habeas claims that have been "adjudicated on the merits in state court proceedings" only if the state court's adjudication resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

II. Analysis

As noted above, petitioner raises five habeas claims. I address them in the order they were presented in the petition.

A. Sufficiency of the Evidence

Petitioner argues that his convictions should be overturned because there was insufficient evidence that he acted with malice aforethought, was the actual shooter, aided or abetted the actual shooter, or had the specific intent to kill. The California Court of Appeal rejected this claim in a reasoned opinion on direct review:

> Defendant was prosecuted for the first degree murder of Jimenez under two principal theories: premeditated and deliberate murder as an aider and abettor and conspiracy to commit first degree murder. Defendant was prosecuted for the attempted murder of Robinson primarily under the theory that he aided and abetted the crime with premeditation and deliberation. The verdict forms did not indicate on which theory the jury agreed in finding defendant guilty of these crimes.
>
> On appeal, defendant argues the evidence presented at trial is insufficient to support his convictions. He concedes the evidence is sufficient to show he was "present in the Tahoe at the time of the shooting," but argues that his mere presence at the scene and subsequent flight therefrom does not constitute substantial evidence to justify his convictions. According to defendant, no rational jury could have found beyond a reasonable doubt that he acted with malice aforethought, was the actual shooter, aided or abetted the

actual shooter, or had the specific intent to kill Robinson. In support of this argument, defendant asserts that there is no substantial evidence showing what he was doing in the Tahoe at the time of the shooting, whether he fired a gun, how or why he possessed malice aforethought, or that he specifically wanted Robinson dead. Defendant further asserts that there was no substantial evidence of any express or implied agreement between defendant and anyone else to kill Jimenez or Robinson.

For the reasons set forth below, we reject this claim. Because we conclude the record contains substantial evidence to support defendant's murder and attempted murder convictions under an aiding and abetting theory of liability, we need not and do not address defendant's sufficiency of the evidence contention regarding the alternative conspiracy theory of liability. (*People v. Rundle* (2008) 43 Cal.4th 76, 141 ["'We need not consider [a sufficiency of the evidence] claim . . . when the court can determine from the record that the verdict rested on a theory which is supported by sufficient evidence'"], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

A. *Standard of Review*

"'"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212-1213.)

"'The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

The jury is entitled to draw reasonable inferences based on the evidence (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166), and we must accept all logical inferences the jury might have drawn from the evidence, even if we would have concluded otherwise (*People v. Salazar* (2016) 63 Cal.4th 214, 242). "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt

beyond a reasonable doubt. [Citation.]'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support ' the jury's verdict." (*Id.* at p. 357.)

B. *Applicable Legal Principles*

Murder, whether in the first or second degree, "is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice can be express or implied. It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with "no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart" (§ 188, subd. (a)(2)). If the murder is "willful, deliberate, and premeditated," it is first degree murder. (§ 189, subd. (a).) ""Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 58.)

Attempted murder requires " 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) Thus, unlike murder, an attempted murder requires express malice and cannot be proved based upon a showing of implied malice. (*People v. Bland* (2002) 28 Cal.4th 313, 327-328.) Furthermore, "unlike murder, attempted murder is not divided into degrees. The prosecution, though, can seek a special finding that the attempted murder was willful, deliberate, and premeditated, for purposes of a sentencing enhancement." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605; *see People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1049 ["attempted murder is not a lesser included offense of attempted premeditated murder, but premeditation constitutes a penalty provision that prescribes an increase in punishment"].)

"Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*People v. Canizales, supra*, 7 Cal.5th at p. 602; *see People v.Nguyen* (2015) 61 Cal.4th 1015, 1055 (*Nguyen*) ["'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction'"]; *People v. Avila* (2009) 46 Cal.4th 680, 701 [intent to kill or express malice may be inferred from the defendant's acts and the circumstances of the crime].) As one example, "the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice." (*People v. Smith* (2005) 37 Cal.4th 733, 742.)

"A person who aids and abets the commission of a crime is culpable as a principal in that crime. [Citation.] Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime." (*People v. Gentile* (2020) 10 Cal.5th 830,

843, superseded by statute on other grounds as stated in People v. Birdsall (2022) 77 Cal.App.5th 859.) "'A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."'" (*Nguyen*, *supra*, 61 Cal.4th at p. 1054.) Establishing aider and abettor liability "requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea— knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) Where murder and/or attempted murder is alleged, the aider and abettor must know and share the murderous intent of the actual perpetrator. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; *Gentile*, at pp. 844-845; *Nguyen*, *supra*, 61 Cal.4th at p. 1054.)

An aider and abettor's intent may be formed either before or during the commission of the crime. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039.) The jury may infer the defendant's intent from circumstantial evidence. (*People v. Beeman* (1984) 35 Cal.3d 547, 558-559.) "'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.'" (*Nguyen*, *supra*, 61 Cal.4th at p. 1054; *see People v. Abelino* (2021) 62 Cal.App.5th 563, 578 [presence at the scene of the crime and failure to take steps to prevent a crime may be "considered together with other evidence in determining that a person is an aider and abettor"].) The jury may also consider flight and deliberately false statements concerning the offense in determining whether a defendant aided and abetted in the commission of the crime. (*People v. Lara* (2017) 9 Cal.App.5th 296, 322.)

C. *Analysis*

Viewing the evidence in the light most favorable to the judgment, we conclude there was sufficient evidence to support defendant's murder and attempted murder convictions. At trial, the prosecution introduced evidence from which a reasonable jury could have concluded that defendant was driving the Tahoe when it chased after the Impala at high speeds through a residential neighborhood while multiple gunshots were fired at the Impala from both sides of the Tahoe. There was also evidence from which a reasonable jury could have concluded that three people were inside the Tahoe during the chase, defendant was present at the scene where the Impala crashed and numerous gunshots were fired into the Impala from close range, three guns were used in the shooting (including a gun that appeared in a video posted on defendant's Snapchat account), three people (including defendant) immediately fled the scene on foot, and defendant lied during his police interview when he claimed the Tahoe had been stolen. Under the circumstances

> presented, defendant's actions, including his conduct before and after the shooting, provided a sufficient basis for the jury to conclude that he aided the commission of the murder and the attempted murder with knowledge of the direct perpetrators' intent to kill and with the purpose of facilitating the direct perpetrators' accomplishment of the intended killings. In short, there was substantial evidence that defendant knew the passengers in the Tahoe intended to shoot and kill the people inside the Impala (Jimenez and Robinson), that defendant shared the shooters' intent to kill Jimenez and Robinson, and that defendant assisted the shooters in killing Jimenez and attempting to kill Robinson. (*See In re Jose D.* (1990) 219 Cal.App.3d 582, 585 [substantial evidence supported the finding that the defendant aided and abetted attempted murder where the defendant "deliberately maneuvered the car" near the victims as his passenger pointed a gun at them, and the defendant parked the car in front of a house where the passenger fired at another victim].) Although the verdicts reflect that the jury could not agree on whether defendant fired a gun, such agreement was not necessary to support the murder and attempted murder convictions. Even if defendant did not fire a gun, the record contains sufficient evidence to support the conclusion that he facilitated the crimes through his actions with the requisite knowledge and intent.
>
> Defendant's arguments for a contrary result essentially ask us to reevaluate the evidence in a light that is not most favorable to the judgment and to draw different inferences than the jury, in violation of the principles of substantial evidence review. We decline to do so. On substantial evidence review, it is well settled that an appellate court must accept all logical inferences the jury might have drawn from the evidence, even if the court would have concluded otherwise (*People v. Salazar*, *supra*, 63 Cal.4th at p. 242), and that "reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 357.) We cannot reach such a conclusion here.

ECF No. 13-18 at 6-12. The California Supreme Court summarily denied the claim when it was raised in a petition for review. ECF No. 13-20.

A federal habeas court evaluating a sufficiency of the evidence claim considers only whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original). "[Sufficiency-of-the-evidence] claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). A federal habeas

court may overturn a state court decision rejecting an insufficient evidence claim "only if the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).

Here, as the state court of appeal found, there was substantial evidence presented that petitioner was driving the Tahoe and that the passengers in that vehicle intended to kill the individuals in the Impala. *See* ECF No. 13-5 at 60-61 (video evidence of muzzle flashes coming from the Tahoe); ECF No. 13-6 at 94 (fingerprint evidence showing petitioner's print on the Tahoe's interior driver-side door). Accordingly, petitioner is not entitled to any relief on this claim.

B. Inconsistent Verdicts Claim

Next, petitioner argues that his conviction for Jimenez's murder should be reversed because the jury could not reach a verdict on the count that charged him with assaulting Jimenez with a firearm. The California Court of Appeal also rejected this claim in a reasoned decision:

> Defendant next argues his conviction for the murder of Jimenez must be reversed because the guilty verdict on that count is inconsistent with the jury's failure to reach a verdict on the count charging him with assaulting Jimenez with a firearm.
>
> A. *Applicable Legal Principles*
>
> Under section 954, "[a]n acquittal of one or more counts shall not be deemed an acquittal of any other count." It is well settled that section 954 permits inconsistent verdicts to stand if they are otherwise supported by substantial evidence. (*People v. Lewis* (2001) 25 Cal.4th 610, 656; *People v. Miranda* (2011) 192 Cal.App.4th 398, 405.)
>
> Our Supreme Court has explained: "As a general rule, inherently inconsistent verdicts are allowed to stand. [Citations.] For example, 'if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both.' [Citation.] Although '"error," in the sense that the jury has not followed the court's instructions, most certainly has occurred' in such situations, 'it is unclear whose ox has been gored.' [Citation.] It is possible that the jury arrived at an inconsistent conclusion through 'mistake, compromise, or lenity.' [Citation.] Thus, if a defendant is given the benefit of an acquittal on the count on which he was acquitted, 'it is neither irrational nor illogical' to require him to accept the burden of conviction on the count on which the jury convicted." (*People v. Avila* (2006) 38 Cal.4th 491, 600 (*Avila*).) Further, " 'The law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal

justice system that gives defendants the benefit of a reasonable doubt as to guilt, and juries the power to acquit whatever the evidence.'" (*People v. Ramirez* (2022) 13 Cal.5th 997, 1122.)

B. Analysis

We reject this claim. As a threshold matter, it fails because this case does not involve inconsistent verdicts. The jury's deadlock on the assault with a firearm count is not a verdict but instead a "nonevent that does not bar retrial." (*Yeager v. United States* (2009) 557 U.S. 110, 118.) "To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room. But that is not reasoned analysis; it is guesswork. Such conjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did not return." (*Id.* at pp. 121-122, fn. omitted.) "[T]he fact that a jury hangs is evidence of nothing—other than, of course, that it has failed to decide anything." (*Id.* at p. 125.)

Even were we to assume the jury acquitted defendant on the assault with a firearm count and that such a "verdict" would be inconsistent with the jury's guilty verdict on the murder count,[8] an inherently inconsistent verdict is generally "allowed to stand." (*People v. Santamaria* (1994) 8 Cal.4th 903, 911; *Avila*, *supra*, 38 Cal.4th at p. 600.) Although defendant recognizes the general rule, he nonetheless urges us to apply the limited judicial exception established in *In re Johnston* (1935) 3 Cal.2d 32. There, the defendants were convicted of conspiracy, even though they were acquitted of all crimes that served as the overt acts for the conspiracy charge. Our Supreme Court held that because the defendants were acquitted of the predicate crimes, they necessarily were acquitted of conspiracy. (*Id.* at pp. 34-36.)

The *Johnston* exception clearly does not apply here, as there was no criminal conspiracy count alleged against defendant. (6 Witkin, Cal. Criminal Law (4th ed. 2023) § 87 [discussing *Johnston* exception as a "[s]pecial" rule regarding conspiracy cases].) Defendant, for his part, cites no authority persuading us to adopt his position. Indeed, he has not directed us to any nonconspiracy case applying the *Johnston* exception. And we find his reliance on *People v. Hamilton* (1978) 80 Cal.App.3d 124, misplaced. In *Hamilton*, the appellate court said that the Johnston exception applied "where all of the essential elements of the crime of which the defendant was acquitted are identical to some or all of the essential elements of the crime of which he was convicted, and proof of the crime of which the defendant was acquitted is

[8] [footnote nine in original text] Although we need not reach the issue, we find no merit in defendant's contention that it was "fundamentally arbitrary" or inconsistent for the jury to find him guilty of murdering Jimenez but deadlock on the count charging him with assaulting Jimenez with a firearm. The People primarily prosecuted defendant for murder under conspiracy and aiding and abetting theories, neither of which required defendant to use or do any act with a firearm.

> necessary to sustain a conviction of the crime of which the defendant was found guilty." (*Id.* at p. 130.) However, despite its broad statement of the exception, the only example the *Hamilton* court cited has to do with its application in conspiracy cases. (*Ibid.*) The court explained that the exception applies "where a conspiracy count alleges as the only overt act a crime set forth specifically in another count, and the defendant is found not guilty of the specific crime, but is found guilty of conspiracy; such an inconsistency invalidates the conspiracy conviction." (*Ibid.*) We agree with the courts that have criticized *Hamilton* as inaccurately describing the *Johnston* exception as broadly applying to all crimes. (*See*, *e.g.*, *People v. Pahl* (1991) 226 Cal.App.3d 1651, 1659-1660 [*Hamilton* accurately describes the conspiracy exception, "but it generalizes as if the exception applies to all crimes. Because it does not, [the language in Hamilton] is inaccurate and misleading."].) While we are bound by *Johnston*, we are not required to extend *Johnston* beyond its facts and setting in conspiracy law. (*Pahl*, at p. 1659.) Moreover, the language that defendant relies on in *Hamilton* is dicta; the *Hamilton* court did not apply the *Johnston* exception; *e.g.*, *People v. Pahl* (1991) 226 Cal.App.3d 1651, 1659-1660 [*Hamilton* accurately describes the conspiracy exception, "but it generalizes as if the exception applies to all crimes. Because it does not, [the language in *Hamilton*] is inaccurate and misleading."].) While we are bound by *Johnston*, we are not required to extend *Johnston* beyond its facts and setting in conspiracy law. (*Pahl*, at p. 1659.) Moreover, the language that defendant relies on in *Hamilton* is dicta; the *Hamilton* court did not apply the *Johnston* exception; instead, it found that the essential elements of the offenses were not identical. (*Hamilton*, at pp. 130-131.)
>
> In short, we decline defendant's invitation to broadly expand the *Johnston* exception in the manner he requests, since doing so would be inconsistent with the text of section 954 and decisions by our Supreme Court generally permitting inconsistent verdicts to stand. (*See, e.g.*, *People v. Lewis, supra*, 25 Cal.4th at p. 656; *Avila*, *supra*, 38 Cal.4th at p. 600.) As our high court has explained, "[A] 'criminal defendant . . . is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. . . . [No] further safeguards against jury irrationality are necessary.'" (*Avila*, at p. 601.) Here, as we have discussed, the record contains sufficient evidence to support defendant's conviction for murdering Jimenez.

ECF No. 13-18 at 12-15. The California Supreme Court also rejected this claim in a summary denial. ECF No. 13-20.

This claim is denied because, as respondent points out, the Supreme Court has expressly held that inconsistent verdicts do not warrant federal habeas relief. *See Ferrizz v. Giurbino*, 432 F.3d 990, 992 (9th Cir. 2005) ("The Supreme Court has made it clear that inconsistent verdicts

may stand when one of those verdicts is a conviction and the other an acquittal.") (citing *United States v. Powell*, 469 U.S. 57, 65 (1984), and *Dunn v. United States*, 284 U.S. 390, 393 (1932)).

C. Exclusion of Expert Testimony

Next, petitioner argues that the trial court erred in excluding expert testimony concerning adolescent brain development. The California Court of Appeal rejected this claim as follows:

> *Evidentiary Error*
>
> Defendant next argues the trial court prejudicially erred in excluding expert testimony about adolescent brain development during the guilt phase of trial.
>
> A. *Additional Background*
>
> Defendant was 19 years old at the time of the events giving rise to this case. Prior to trial, he moved for an order allowing expert testimony on the psychological development of adolescents from Dr. Elizabeth Cauffman, a psychology professor at the University of California, Irvine. In support of his motion, defendant explained that the proposed testimony would "educate the jury concerning psychosocial maturity"; specifically, "how adolescents differ from fully mature adults in the areas of how young people consider the consequences of their actions, how sensitive they are to rewards, how susceptible youth are to peer influence, and how much youth are able to regulate their impulsive behavior." Defendant argued (among other things) that such testimony was relevant and admissible on the intent element of the murder and attempted murder charges (i.e., malice aforethought), and the allegation that the murder was committed willfully and with premeditation and deliberation. Defendant asserted that evidence about "princip[le]s of adolescent development" such as that "young people have a lesser ability to consider the consequences of their actions and regulate their impulsive behavior" would have "tend[ed] to disprove" that the murder was willful, premeditated, and deliberate, and would "assist the trier of fact in making a determination whether [he] committed first degree murder." Defendant further argued that the proposed testimony was relevant and admissible on the prosecution's aiding and abetting theory of liability. Defendant claimed that Dr. Cauffman's testimony would educate the jury about the "lesser psychosocial maturity" of adolescents and their "lesser capacity" to regulate their impulses and to assess the consequences of their actions and that such evidence was "part of the totality of the circumstances analysis for the jury to determine if [he] was actually aiding and abetting in the offense alleged, was simply present, or merely acting impulsively without an intent to aid and abet the principals." He added the expert testimony was necessary to educate the jury as to why an adolescent would not do anything to "stop the actions in question," including "relaying a body of research that teenagers are especially susceptible to the influence of their peers."

The People filed their own pretrial motion seeking to exclude any testimony from Dr. Cauffman about the "generalized characteristics of the adolescent brain" and how such characteristics affect criminal liability (i.e., culpability). The People conceded that such evidence was relevant to "sentencing mitigation," but argued that it was not relevant to guilt phase issues (e.g., intent to kill). They maintained that Dr. Cauffman's opinions would not assist the jury in assessing guilt because the opinions were not based on any medical diagnosis of defendant and were too generalized. They observed the prohibitions of sections 28 and 29 of the Penal Code on expert opinions regarding formation of the requisite intent. Finally, they asserted evidence showing that adolescents do not engage in mental processes the same way as "fully developed adults" was not the proper subject of expert testimony because this "concept" was not "outside the understanding or everyday experiences of jurors."

After a hearing, the trial court tentatively granted the People's motion, explaining that while the proposed expert testimony could be helpful and relevant to its sentencing decisions, it was doubtful that the testimony was "relevant to any element of the charges or to any defense." The court, however, invited defendant to file a reply brief addressing this issue. After defendant did so,[9] another hearing was held. At the conclusion of that hearing, the court stated: "As of this moment I am not intending to allow Dr. Cauffman's testimony on the issue of guilt before the jury. If we ever get to a sentencing situation, I would certainly consider that testimony." In ruling, the court noted that defendant had not cited any California case holding that the proposed expert testimony was admissible on issues related to guilt.

B. *Applicable Legal Principles*

"[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment. [Citations.] 'This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.'" (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.)

"'To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.]' [Citation.] 'Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review.' [Citation.] 'Hence,

[9] [footnote ten in original text] Defendant's reply brief largely reiterated and elaborated on the points he raised in his moving papers. Although defendant insisted that Dr. Cauffman's testimony about the lack of psychosocial maturity in youth was relevant to guilt phase issues (e.g., the aiding and abetting theory of liability, intent to kill), he cited no California cases holding such evidence was admissible for those purposes.

> conclusory claims of error will fail.'" (*Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1457.)
>
> We review any ruling by the trial court on the admissibility of evidence under the abuse of discretion standard. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, overruled on another ground in *People v. Rundle*, *supra*, 43 Cal.4th at p. 151.) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*Guerra*, at p. 1113.)
>
> C. *Analysis*
>
> We conclude defendant has not met his burden to show reversible error. Defendant's undeveloped appellate argument amounts to a mere suggestion of evidentiary error without sufficient supporting argument or authority other than general abstract principles regarding the admissibility of expert testimony. Defendant has not cited, and our independent research has not disclosed, any California authority supporting the conclusion that it is proper for an expert to testify in a general manner about adolescent brain development at the guilt phase of trial for the purpose of assisting the jury in determining whether a particular adolescent possessed the requisite mental state (e.g., malice aforethought) to be convicted of a crime (e.g., first degree murder) or in determining aider and abettor liability. While a youth's cognitive maturity is certainly a relevant consideration at sentencing (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1386-1390), no California court (as far as we are aware) has held that the *general development differences* between an adult brain and an adolescent brain are relevant in determining *criminal liability* for a *particular youthful defendant*.
>
> Further, we discern no prejudice from the trial court's refusal to allow the proposed expert testimony during the guilt phase of trial. The jury was unable to reach a verdict on the allegations that the murder and attempted murder were deliberate and premeditated, and, as we have described, there was substantial and compelling evidence supporting the conclusion that defendant aided and abetted the murder of Jimenez and the attempted murder of Robinson with the requisite knowledge and intent.

ECF No. 13-18 at 15-19. The California Supreme Court subsequently issued a summarily denial of this claim. ECF No. 13-20.

This claim fails because challenges to a state court's evidentiary rulings are not reviewable by a federal habeas court unless the ruling violated a petitioner's due process right to a fair trial. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The exclusion of evidence does not violate a petitioner's due process rights unless it "offends some principle of justice so rooted in the

traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (citation and internal quotation marks omitted). Here, the exclusion of this expert testimony cannot be said to have deprived petitioner of a fair trial. As the state court reasonably found, expert testimony as to the difference between an adolescent and adult brain, while potentially relevant in sentencing, was not relevant in the determination of criminal liability. Moreover, the Supreme Court has not squarely addressed whether a court's exclusion of expert testimony violates a criminal defendant's right to present relevant evidence. *See Moses v. Payne*, 555 F.3d 742, 758 (9th Cir. 2009). Thus, there can be no violation of clearly established federal law.

D. Prosecutorial Misconduct

Petitioner argues that the prosecutor committed misconduct during closing argument by suggesting that petitioner could be convicted of attempted murder under an invalid theory of conspiracy liability. The California Court of Appeal rejected this argument:

> Defendant next argues the prosecutor committed prejudicial misconduct during closing argument by misleading the jury in a manner that strongly suggested he could be convicted of attempted murder under an invalid theory of conspiracy liability.
>
> A. *Additional Background*
>
> 1. *First Amended Information*
>
> The first amended (operative) information charged defendant with six crimes, including murder and attempted murder. As an enhancement, the People alleged that the murder was in the first degree in that it was willful, deliberate, and premeditated. Defendant was not charged with the crime of conspiracy,[10] although the People relied on evidence of an uncharged conspiracy to prove first degree murder.
>
> 2. Jury Instructions
>
> Prior to deliberations, the jury was instructed on the substantive offenses pursuant to pattern jury instructions, including instructions

[10] [footnote eleven in original text] "Conspiracy '"is an inchoate offense, the essence of which is an agreement to commit an unlawful act."' [Citation.] This crime has four elements: (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator." (*People v. Ware* (2022) 14 Cal.5th 151, 163.)

on first degree murder, second degree murder, and attempted murder. (*See* CALCRIM Nos. 520, 521, and 600.) These instructions explained that, to support guilty verdicts on the murder and attempted murder offenses, the People had the burden to show (among other things) that defendant intended to kill a person when he acted.

The jury was also instructed on the conspiracy theory of liability pursuant to CALCRIM No. 416. The jury was told that the People had presented evidence of an uncharged conspiracy to commit first degree murder, and that to establish that defendant was a member of that conspiracy, the People were required to prove: (1) defendant intended to agree and did agree with uncharged codefendants to commit murder in the first degree; (2) at the time of the agreement, the defendant and the other alleged members of the conspiracy intended that one or more of them would commit murder in the first degree; (3) the defendant, or uncharged codefendants committed certain overt acts to accomplish murder in the first degree (e.g., armed themselves with firearms, pursued the Impala while discharging firearms at the Impala until it collided with a residence, fired multiple bullets at the Impala after the collision); and (4) the overt acts were committed in California.

The CALCRIM No. 416 instruction also instructed the jury as follows: "The People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder in the first degree. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit one or more of those crimes. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

"An overt act is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime. The overt act must happen after the defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.

"You must all agree that at least one overt act was committed in California by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts.

"A member of a conspiracy does not have to personally know the identity or roles of all the other members.

"Someone who merely accompanies or associates with members of a conspiracy but who does not intend to commit the crime is not a member of the conspiracy.

"Evidence that a person did an act or made a statement that helped accomplish the goal of the conspiracy is not enough, by itself, to prove that the person was a member of the conspiracy."

. . .

As for the aider and abettor theory of liability, the jury was instructed pursuant to CALCRIM No. 401. That instruction stated, in relevant part:

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"To aid and abet Murder in Count 1, the defendant must share the perpetrator's malice aforethought and to aid and abet Attempted Murder as charged in Count 2, the defendant must share the perpetrator's specific intent to kill.

"Malice Aforethought is defined in CALCRIM No. 520 & 521.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him an aider and abettor."

3. *Closing Argument*

At the outset of closing argument, the prosecutor stated:

"So what are different theories of liability that we are going to present to you today? Well, the first is just the actual perpetrator themselves. This is the individual that [sic] committed the crime. This could be firing a firearm into an occupied vehicle, assault with a deadly weapon or murder. This is the straightforward, you pulled the trigger, somebody died, you're the perpetrator.

"Aiding and abetting. . . . I'll go into a lit[tle] bit more detail, but essentially, that's when you are offering an assist. That's when you're doing an act and it is furthering someone else's objective. So if that objective is to kill somebody with a gun and you hand that person the gun, you are aiding and abetting that objective to kill.

"Conspiracy is similar, but it's just a little different in which it's actually the agreement to commit the crime. That is the liability, not the actions of that particular individual. You can enter into an agreement to kill, and you can enter into an agreement that somebody in your group that you are coming together and having that agreement with is going to do something to kill somebody. And even if you don't do anything further, you don't take one of those overt acts, you just agreed, you're liable.

"So this is the way—it kind of works in a flow chart. So guilty is the objective, when you actually do the crime. You're either the perpetrator, the person pulling the trigger of the gun, or you're helping that person in some way, giving them the weapon, driving the car, pulling up alongside the vehicle. Those are aiding and abetting type actions.

"Then there's conspiring to do it. It doesn't require an action on your part, but it requires you to come to an agreement and somebody within that group does something to further the crime, the conspiracy.

"Must you all agree on the theory? Well, you're jurors. Jurors have to reach unanimous verdicts when it comes to guilty or not guilty. But in these circumstances, no. One of you can think it's aiding and abetting. One of you can think it's conspiracy. One of you can think it's a perpetrator. You don't have to all agree on which theory of liability it is, but you all have to agree that there's liability there in order to find guilt."

At that point, defense counsel objected "based on the jury instructions and what the conspiracy is alleged to the count that it deals with." In response, the trial court instructed the jurors that they did not "have to all agree on the overt acts, but to find someone guilty under the theory of conspiracy, you all have to agree that the conspiracy was present." The court further instructed the jury that "[t]o convict someone on the theory of aiding and abetting, you all have to agree on that."

Thereafter, the prosecutor explained that the People's theory was that defendant aided the shooter in the commission of the "crime." He then said: "So conspiracy is similar, but just different enough where you can get confused. It's important to know the differences. It's the person intended to agree and did agree with one co-conspirator. The defendant and one co-conspirator intended that at least one of them would commit the crime, and any conspirator committed one overt act. [¶] They do not have to meet. They don't have to have detailed plans. They don't even have to discuss it. It just can be inferred from the conduct. They're operating with one common purpose." The prosecutor went on to identify the specific overt acts listed in the jury instruction, and then told the jurors that they did not have to agree on which overt acts were committed, they just had to agree that at least one of the co-conspirators committed an overt act that furthered the conspiracy to commit a "crime."

After the prosecutor discussed the law regarding the charged offenses (including the requirements for first degree murder and attempted murder), he explained that there were three theories of liability "at play here," and indicated that the jury needed to decide whether defendant was the perpetrator (i.e., one of the shooters), whether he aided and abetted the shooters, or conspired with another to commit murder. The prosecutor went on to discuss (at length) the evidence presented at trial and concluded his remarks by stating: "Is it reasonable to think that [defendant] didn't have a part to play, that [defendant] wasn't an active participant in this situation? [He] didn't have a role? That [he was not] aiding and abetting? [He was not] conspiring? [¶] Is it reasonable to think that . . . defendant didn't have a part to play in[] [the] killing [of] Brenda Jimenez and the shooting of Kenneth Robinson. And the answer is no, it's not reasonable, and you should find him guilty because of that."

In response, defense counsel specifically told the jurors at the beginning of her remarks that the conspiracy theory of liability only applied to first degree murder and encouraged the jurors to "re-read the law" on the theory as instructed by the trial court. Thereafter, defense counsel stated: "[T]he [People's] primary argument is that [defendant] is responsible for the murders as an aider and abettor. They're saying that he's not the person who pulled the trigger, although I guess they did give you some facts in their closing to support that maybe he was the perpetrator, but I think it's pretty clear from the evidence, as well as [the prosecutor's] opening statements and the witnesses that were called, that the [People's] main theory is a theory of aiding and abetting. [¶] They want you to find [defendant] guilty of an intent to kill, but they're speculating about that because there's no evidence that's been introduced at all as to what [defendant's] intent was on May 6th of 2021."

Defense counsel explained to the jury that, as instructed by the trial court, simply being present at the scene of a murder is not enough for aider and abettor liability, even if the person knew a murder was going to happen, did nothing to stop it, and fled after the murder occurred. Counsel noted the People had the burden to prove defendant knew the shooter intended to commit murder and also intended to aid and abet the shooter in committing the murder by words or conduct. She argued the People had not met their burden to show that defendant aided and abetted the murder, including proving that defendant knew the perpetrator intended to commit murder, that defendant shared the intent of the perpetrator, and that defendant's words or conduct facilitated or encouraged the murder. In making this argument, defense counsel questioned whether there was evidence showing that defendant was the driver of the Tahoe, and claimed that, at most, the People had proved that defendant was in the "vicinity" where Jimenez was shot and killed.

As for the conspiracy theory of liability, defense counsel argued there was no evidence establishing that defendant engaged in a conspiracy to commit first degree murder, including evidence of an express or implied agreement between two or more people to commit first degree murder. In making this argument, counsel

emphasized multiple times that the People needed to prove there was an agreement to commit first degree murder before any of the alleged overt acts occurred. Later, counsel reiterated that the conspiracy theory of liability pertained to first degree murder, and that to obtain a conviction for this crime under such a theory, the People had the burden to prove that defendant "shared the express malice [of the shooter], shared that intent to kill." She added that the People also had the burden to show the same shared intent with respect to the aiding and abetting theory and argued there was no evidence defendant shared the shooter's express malice or intent to commit murder. In her concluding remarks, defense counsel insisted that the People had failed to prove defendant aided and abetted the murder or attempted murder and asserted that there was "absolutely no evidence of an agreement to commit first degree murder."

In rebuttal, the prosecutor discussed the concept of circumstantial evidence and argued that the circumstantial evidence here proved an intent to kill, including evidence that the Tahoe chased after the Impala, gunshots were fired from the Tahoe at the Impala during the chase until there was a collision, and the occupants of the Tahoe "continued to pursue [the Impala]" until Jimenez was shot and killed. The prosecutor then said: "And the intent, the conspiracy, those don't have to be plotted out ahead of time. They can happen in that moment." By way of example, the prosecutor explained: "You're out and about. Things start going south. Guns are going. You jump into the fray and you help out, that's aiding and abetting. [¶] Conspiracy. You don't have to have a meeting. You don't have to set up a flow chart of who's going to do what, have an organizational structure. [¶] Hey, I'm having a good time, or out drinking, dancing, enjoying yourselves. Let's keep it up and have a little bit of fun. What's a little bit of fun? Let's go to Broderick and mess around and take some shots at people."

B. *Applicable Legal Principles*

" ' "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." ' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1331-1332.)

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law. . . .' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666.) "To establish such error, bad faith on the prosecutor's part is not required. [Citation.] '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' " (*Id.* at pp. 666-667.)

When the claim for prosecutorial misconduct "focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) In conducting this inquiry, appellate courts " 'should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.' " (*People v. Cortez* (2016) 63 Cal.4th 101, 133.) " 'A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Flores* (2020) 9 Cal.5th 371, 403.)

"As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841; *see People v. Parker* (2022) 13 Cal.5th 1, 71-72.) Our Supreme Court has repeatedly invoked this rule to reject prosecutorial misconduct claims based on statements made in closing arguments. (*See, e.g., People v. Powell* (2018) 6 Cal.5th 136, 171; *People v. Winbush* (2017) 2 Cal.5th 402, 481; *People v. Shazier* (2014) 60 Cal.4th 109, 145.) " 'The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' " *(People v. Hoyt* (2020) 8 Cal.5th 892, 942-943.)

C. *Analysis*

As a preliminary matter, we conclude defendant has forfeited his claim of prosecutorial misconduct. On appeal, defendant asserts the prosecutor made multiple improper remarks about the conspiracy theory of liability during closing argument, but the record reflects defense counsel lodged only one vague objection (that did not clearly identify the basis of the prosecutor's misconduct/impropriety) and did not request an admonition. The objection was "based on the jury instructions and what the conspiracy is alleged as to the counts that it deals with." At no point during closing argument did defense counsel object on the specific ground raised on appeal; namely, that the prosecutor improperly argued or suggested that attempted murder liability could be predicated on the conspiracy theory. And we are unpersuaded by defendant's contention that his failure to properly object and request an admonition should be excused.

Forfeiture aside, we find no prejudicial misconduct. On the record before us, we cannot conclude the challenged remarks infected the trial with such unfairness as to make the attempted murder conviction a denial of due process. Nor can we conclude the prosecutor's remarks rendered the trial fundamentally unfair due to the use of deceptive or reprehensible methods to attempt to

> persuade the jury. Initially, we observe the prosecutor never explicitly urged the jury to return a guilty verdict on the attempted murder count based on the conspiracy theory of liability. A fair reading of the record reveals, at most, that the challenged remarks were ambiguous as to whether the People were relying on such a theory on the attempted murder count. For her part, defense counsel emphasized multiple times during closing argument that the conspiracy theory applied to first degree murder. In doing so, defense counsel specifically told the jury that this theory only applied to the murder count. And the pattern instruction given to the jury on the conspiracy theory only referred to a conspiracy to commit first degree murder. Moreover, the jury was properly instructed on the elements of attempted murder, which required a finding that defendant took at least one direct but ineffective step toward killing another person and he intended to kill that person. (*See* CALCRIM No. 600.) The jury was also properly instructed to follow the law as explained by the trial court if it believed the attorneys' comments on the law conflicted with those instructions. (*See* CALCRIM No. 200.)
>
> In view of the evidence presented at trial, the jury instructions, and all arguments of counsel, we are convinced that there is no reasonable likelihood the jury construed or applied any of the complained-of remarks in an objectionable fashion. Moreover, we see no basis to conclude that it is reasonably probable that a result more favorable to defendant would have been reached absent the asserted misconduct.

ECF No. 13-18 at 19-29. The California Supreme Court summarily denied this claim. ECF No. 13-20.

This claim is denied because there was, as the state court of appeal found, no reasonable likelihood that the jury applied the prosecutor's remarks in a way that prejudiced petitioner. The jury was, as the court of appeals found, properly instructed under state law, and jurors are presumed to follow their instructions. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *Kansas v. Marsh*, 548 U.S. 163, 179 (2006).

E. Juror Misconduct

Lastly, petitioner argues that the trial court erred when it denied his motion for a new trial after a juror committed misconduct by sharing his personal expertise regarding firearms and fingerprints with other jurors. The California Court of Appeals also denied this claim:

> Finally, defendant argues the trial court erred in denying his motion for new trial based on juror misconduct. He claims Juror No. 6 engaged in misconduct by sharing with other jurors his personal

expertise about firearms and fingerprints. Defendant insists that Juror No. 6 improperly presented facts to the jury beyond the scope of the evidence introduced at trial, which helped convince the jury he was the driver of the Tahoe and that the shooters acted with the specific intent to kill Robinson.

A. *Additional Background*

After the jury rendered is verdicts but prior to sentencing, defendant moved to unseal juror information, arguing that such relief was warranted to support a potential motion for new trial based on juror misconduct. The trial court granted the motion and defendant's related request for the appointment of substitute counsel (i.e., conflict). Thereafter, defendant filed a motion for new trial, arguing that such relief was warranted because Juror No. 6 engaged in misconduct by sharing with other jurors his personal experience with the military, expertise with firearms and ballistics, and specialized knowledge about fingerprints.

In support of his motion, defendant did not submit a declaration from Juror No. 6 or any other juror. Instead, defendant's motion contained a summary of a posttrial interview of Juror No. 6 conducted by a private defense investigator. The summary stated that, during deliberations, Juror No. 6 told other jurors about his military experience (28 years in the Army Reserves) and expertise with firearms and ballistics.

Juror No. 6 shared that he was able to determine from the video recording played by the prosecution that there were two firearms used during the "first volley of shots" (i.e., during the car chase) "based on how the shots were happening." Juror No. 6 also told other jurors that he knew "from practical experience that if you are shooting from a moving vehicle, you're going to be lucky to hit the broadside of a barn." As for the fingerprint evidence, Juror No. 6 told the investigator that he "didn't really discuss [his] expertise of fingerprints with the other jury members," which he acquired while working for a "guard school" and a "civil investigator firm." However, he also said: "My knowledge of fingerprints didn't really help me with determining evidence in the case. The evidence that was presented by the forensic presenter was excellent. I did bring one thing up that I know. I know that when you're nervous, your hands are going to perspire. When your hands perspire, it's easier to leave a fingerprint on a surface. I told all the other jury members this during deliberations. I talked to them about a fingerprint left on the steering wheel and the driver's side door. I didn't talk so much about fingerprints on the trigger or the gun."

The People opposed the motion, arguing that it should be denied because defendant only provided a written summary of an unrecorded interview rather than affidavits signed under penalty of perjury, and because it was not misconduct for Juror No. 6 to rely on his own personal experiences to evaluate the evidence presented at trial. The People further argued that, even if Juror No. 6's actions amounted to misconduct, defendant did not suffer any prejudice because there was no substantial likelihood that any juror

was actually biased against defendant. In making this argument, the People asserted that the statements made by Juror No. 6 mirrored the evidence presented at trial, that Juror No. 6's statements about how many firearms could be heard during the surveillance footage was not outside the common experience shared by at least some of the jurors, that listening to the sound on the surveillance footage and discerning how many firearms were used did not require highly technical experience that only Juror No. 6 was qualified to discuss, and that Juror No. 6's comments "did not lower the People's burden in this case" because there was evidence presented that corroborated Juror No. 6's statements.

Prior to the hearing on the motion, the defense provided the People and the trial court with a declaration signed by Juror No. 6. The substance of this declaration was similar to the summary in the motion. However, in his declaration, Juror No. 6 added that he told other jurors that when a person's hands perspire, "it's easier to leave a fingerprint or DNA evidence on a surface."

At the hearing, defense counsel agreed with the prosecutor that most of the statements in Juror No. 6's declaration were inadmissible because they involved his "subjective state of mind." Nonetheless, defense counsel insisted that there was juror misconduct because Juror No. 6 claimed he was an expert in firearms and fingerprinting, and Juror No. 6's comments to the other jurors in these areas "bolster[ed] the evidence" presented at trial "to the prejudice of [defendant]." In denying the motion, the trial court found that Juror No. 6 and the other members of the jury relied on the evidence presented at trial and followed the law as instructed. The court also found that Juror No. 6 offered his interpretation of the evidence, which was not misconduct.

B. *Applicable Legal Principles and Standard of Review*

A motion for a new trial may be granted on the ground of juror misconduct. (§ 1181, subds. 2-4.) " 'When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible under Evidence Code section 1150, subdivision (a).' [Citation.] 'If the evidence is admissible, the court must then consider whether the facts establish misconduct. [Citation.] Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial.' " (*People v. Engstrom* (2011) 201 Cal.App.4th 174, 182.)

" 'It is well established it is misconduct for a juror to conduct an independent investigation of the facts, to bring outside evidence into the jury room, to inject his or her own expertise into the jury's deliberation or to engage in an experiment which produces new evidence.' " (*People v. Engstrom, supra*, 201 Cal.App.4th at p. 185; see *In re Malone* (1996) 12 Cal.4th 935, 963 (Malone) [a juror commits misconduct by discussing an opinion "explicitly based on specialized information obtained from outside sources"]; *In re Lucas* (2004) 33 Cal.4th 682, 696 ["A juror may commit

misconduct by receiving or proffering to other jurors information about the case that was not received in evidence at trial"].)

While jurors may not present as facts specialized knowledge they claim to possess, a distinction is drawn between the introduction of new facts and a juror's reliance on their life experience when evaluating evidence. (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 76.) Our Supreme Court has explained the difference between the introduction of new facts and reliance on experience to evaluate evidence as follows: "'Jurors' views of the evidence . . . are necessarily informed by their life experiences, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct.'" (*Ibid*.) "A fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,'" which would be "misconduct." (*People v. Steele* (2002) 27 Cal.4th 1230, 1266 ["A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence"].)

"A juror's misconduct raises a presumption of prejudice, which may be rebutted by proof no prejudice actually resulted. [Citations.] 'A judgment adverse to a defendant in a criminal case must be reversed or vacated "whenever . . . the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury." [Citations.] . . . [¶] "The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror."'" (*Malone*, *supra*, 12 Cal.4th at pp. 963-964.) Factors relevant to whether the presumption has been rebutted are the strength of the evidence of misconduct, its nature and seriousness, and the probability that actual prejudice may have ensued. (*McDonald v. Southern Pacific Co.* (1999) 71 Cal.App.4th 256, 265.)

On appeal from a ruling denying a motion for new trial based on juror misconduct, the reviewing court accepts the trial court's factual findings and credibility determinations if they are supported by substantial evidence but exercises its independent judgment to determine whether any prejudicial misconduct occurred. (*People v. Collins* (2010) 49 Cal.4th 175, 242.)

C. *Analysis*

> We find no prejudicial juror misconduct. Our Supreme Court has held that, regardless of their educational or employment background, jurors are allowed to express their opinion on a technical subject, so long as the opinion is based on the evidence at trial. (*Malone*, *supra*, 12 Cal.4th at p. 963.) Similarly, our high court has recognized that trial courts must allow those jurors with specialized knowledge to use their experience in evaluating and interpreting the evidence and express opinions regarding the evidence. (*People v. Steele*, *supra*, 27 Cal.4th at pp. 1265-1266.) In *Steele*, the jury had received evidence about the defendant's military experience and training during the Vietnam War and expert testimony about neurological testing on him. (*Id.* at pp. 1240-1241.) The defendant claimed misconduct by jurors with military experience who told others it was unlikely the defendant had been exposed to combat in Vietnam, and by jurors with experience in the field of medicine who stated that the validity of one of the neurological tests (the "BEAM test") had not been adequately established. (*Id.* at pp. 1259-1260.). Our Supreme Court found no misconduct, explaining as follows: "[E]xtensive evidence was produced concerning the nature and extent of defendant's military training and Vietnam experience and its effect, if any, on his crimes, as well as evidence concerning the validity of BEAM testing. This evidence was susceptible of various interpretations. The views the jurors allegedly asserted here were not contrary to, but came within the range of, permissible interpretations of that evidence. All the jurors, including those with relevant personal backgrounds, were entitled to consider this evidence and express opinions regarding it." (*Id*. at pp. 1265-1266.)
>
> Here, construed in the manner most favorable to defendant's claim of error, the record reflects that Juror No. 6 called upon his personal experience and specialized knowledge in firearms and fingerprints to evaluate and interpret the evidence introduced at trial. Defendant has not shown, and nothing in the record reflects, that Juror No. 6 expressed any opinions during deliberations about firearms that were based on his personal expertise or experience that was different from or contrary to the evidence. To the extent Juror No. 6 told other members of the jury that a person's hands perspire when they are nervous and that its easier for a person to leave a fingerprint or DNA on a surface in such circumstances, these comments do not amount to prejudicial misconduct. Even if we assume the comments constituted an improper injection of external information by a specialist (i.e., misconduct), we are convinced that defendant suffered no prejudice. Given the evidence presented at trial, the assumed misconduct here does not support a finding that there was a substantial likelihood that any juror was improperly influenced to defendant's detriment. (*Malone*, *supra*, 12 Cal.4th at p. 965.)

ECF No. 13-18 at 29-34. This claim was also summarily denied by the California Supreme Court. ECF No. 13-20.

Juror misconduct claims are subject to the Supreme Court's harmless error analysis articulated in *Brecht. v. Abrahamson*, 507 U.S. 619, 638 (1993). *See Jeffries v. Blodgett*, 5 F.3d 1180, 1190 (9th Cir. 1993). Under *Brecht*, the relevant inquiry is whether the misconduct or introduction of extrinsic evidence had a "'substantial and injurious' effect or influence in determining the jury's verdict." 507 U.S. at 638. Here, the state appellate court's determination that the juror's statements and actions were not substantially likely to have affected the verdict was not objectively unreasonable. *See Towery v. Schriro*, 622 F.3d 1237, 1243 (9th Cir. 2010) ("When a state court has found a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's determination is objectively unreasonable."). That is, fairminded jurists could disagree as to its correctness. *See Davis v. Ayala*, 576 U.S. 257, 269 (2015) ("[A] state-court decision is not unreasonable if fairminded jurists could disagree on [its] correctness.") (internal quotation marks omitted). And, if as the appellate court found, the juror at issue in this claim merely shared his own experiences, then there was no violation of federal law. *See Rucker v. Lattimore*, 369 F. App'x 810, 813 (9th Cir. 2010) ("The district court did not err in rejecting Rucker's claim that her constitutional rights were violated when during jury deliberation jurors nine and two discussed their personal experiences as victims of sexual assault."); *Baez v. Fox*, No. CV 17-00198-VBF (SHK), 2018 U.S. Dist. LEXIS 98711, *30 (C.D. Cal. Mar. 16, 2018) ("Moreover, this Court is not aware of any holding by the Supreme Court where a juror's reliance on, or sharing of, his personal experiences to interpret testimony or evidence constitutes misconduct.").

Conclusion

Accordingly, it is RECOMMENDED that the petition for writ of habeas corpus, ECF No. 1, be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days of service of these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Any such document should be captioned "Objections to Magistrate Judge's Findings and Recommendations," and any response shall be served and filed

within fourteen days of service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: October 19, 2026

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE